van Gestel, J.
This matter is before the Court on a motion by the defendants, The Olive Group Corporation (“OGC”) and Omega III, LLC (“Omega III”) (collectively the “Defendants”), seeking summary judgment pursuant to Mass.R.Civ.P. Rule 56 on the second amended complaint of the plaintiff, Chesapeake Investment Services, Inc. (“Chesapeake”).
BACKGROUND
The facts that are not in dispute follow.
OGC is currently the sole member of Omega III. The Defendants were previously operated jointly by James Cafarelli (“Cafarelli”) and Todd English (“English”). Currently, they are being operated exclusively by English.[2]
On August 23, 1999, the Defendants, and other related entities, entered into a Revolving Credit and Term Loan Agreement with BankBoston, N.A., now Fleet Bank (the “Fleet Note”), in the amount of $1.3 million. The purpose of this arrangement was to provide working capital and start-up costs associated with certain restaurant openings in Washington, D.C., Westport, Connecticut, and Boston, Massachusetts.
The Fleet Note was secured by, inter alia, an all-asset interest in OGC and in Omega III, including a security interest in the general intangibles of OGC.
In April 2000, it became apparent that the restaurant being constructed for OGC in Washington, D.C., to be known as “Olives D.C.,” had construction cost overruns of approximately $420,000. A frequent patron of the Olives restaurant in Charlestown, Massachusetts, Frank Gangi (“Gangi”), president of Chesapeake, offered to OGC to loan funds with which to finance these construction cost overruns.
Neither Gangi nor Chesapeake is in the regular business of making loans to restaurants or any other entities.
On April 19, 2000, Gangi, by and through Chesapeake, made a personal loan to Cafarelli and English to cover the Olives, D.C. expenses. Cafarelli and English signed a secured promissory note in the amount of $420,000 (the “April 19, 2000 Note”). This note was secured by a pledge of 25% of the ownership interest in Olives D.C., LLC.
In the summer of 2001, a restaurant in Boston that Cafarelli was developing and constructing for OGC also had significant construction cost overruns. It became necessary to request another loan from Gangi, this time to pay certain cost overruns that were due to CAFCO Development, Inc. (“CAFCO”). CAFCO is a restaurant construction company that Cafarelli founded. On July 11, 2001, Chesapeake loaned Omega III $450,000, represented by a promissory note (the “July 11, 2001, Note”).
The July 11, 2001 Note specifies that the Defendants shall “execute instruments conveying to [Chesapeake] ONE HUNDRED PERCENT (100%) interest in Omega III, LLC, which shall be held by [Chesapeake] in escrow as security for this note ...”
As a result of the impending July 11, 2001 Note transaction, in July of 2001, the Fleet Note was amended by a “Second Amendment to Revolving Credit Term Loan Agreement” (“Amended Revolver”). In this amendment Fleet gave its assent to the July 11, 2001 loan but imposed a number of conditions upon the Defendants and Chesapeake.
Section 12 of the Amended Revolver is where most of the conditions are found. In relevant part, Section 12 reads as follows:
As a condition to [Fleet’s] agreement to entering into this Second Amendment, BORROWERS have advised [Fleet] that BORROWERS, . . . are obtaining funds in the amount of [$450,000] from . . . Chesapeake ... in order to pay in full all indebtedness owing from BORROWERS to . . . [CAFCO] for construction of Omega III, LLC’s Kingfish Hall restaurant at Faneuil Hall Marketplace in Boston... [T]he securiiy therefor . . . shall consist solely of an all asset security interest in the personal property of Omega III, LLC, and a pledge of all of the membership interests of said LLC . . . The closing of said transaction wherein the occurrence of not less than full completion of all of the following is referred to herein as the “Subordinate Lender Closing”: loan and security documents are executed and delivered from Omega III, LLC to Chesapeake; UCC-1 financing statements are filed of record in appropriate *709 filing offices; loan funds are paid in hand to [CAFCO]; and no deviations of any kind from the aforesaid loan term sheet shall have occurred . . . Concurrently herewith, Chesapeake, Omega III, LLC and [Fleet] shall execute and deliver a Subordination Agreement in form and substance acceptable to [Fleet] . . . Concurrently herewith, Chesapeake shall execute and deliver an agreement in form and substance satisfactory to [Fleet] which shall provide that until all of the OBLIGATIONS owing to [Fleet] have been paid in full, Chesapeake, pursuant to the pledge given to it of all of the membership interests in Omega III, LLC, whether as pledgee, or foreclosing secured party, or in any other capacity, shall take no action to amend, alter or change in any way the terms of that certain management agreement dated as of May 23, 2001 between Omega III, LLC in favor of The Olive Group Management, LLC without [Fleet’s] prior written consent.
Apparently, onNovember26,2002, for the first time since the July 11, 2001 loan transaction, Chesapeake filed UCC-1 financing statements naming OGC as the debtor in Delaware, the state in which Omega III is registered, and in Massachusetts.
On July 11, 2001, Omega III and Chesapeake executed the Fleet Subordination Agreement (the “Subordination Agreement”) called for in Section 12 of the Amended Revolver. Among other things, the Subordination Agreement provides as follows:
To secure the performance of this Agreement, [Chesapeake] hereby assign[s], transferís] and set[s] over to [Fleet] the Subordinated Debt, whether evidenced by negotiable or non-negotiable instruments, securities or other writings, book entries or otherwise, together with any collateral therefor, and [has] endorsed or assigned to [Fleet] and herewith deposit the following:
Secured Promissory Note from Omega III, LLC to Chesapeake Investment Services, Inc. dated July 11, 2001.
Notably, in the WHEREAS clause of the Subordination Agreement, it is provided as follows:
WHEREAS, [Omega III and [Chesapeake] have requested [Fleet] ... to grant financial accommodations to [Omega III], and [Fleet] has indicated that it is unwilling to do so unless [Omega III] and [Chesapeake] shall join in this Agreement and [Chesapeake] shall subordinate, to the extent and in the manner hereinafter set forth, the indebtedness hereinbefore referred to [the July 11, 2001, loan] and also all other indebtedness of [Omega III] to [Chesapeake], direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising ... to all indebtedness of [Omega III] to [Fleet], direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising . . .
The Subordination Agreement also permits Chesapeake to receive from Omega III only “regularly scheduled payments of principal and interest” on the July 11, 2001 Note until such time as Fleet is paid in full.
Still further, the Subordination Agreement provides that in the event of a default by the Defendants on the Fleet Note, Chesapeake may neither demand nor accept either payments or collateral from the Defendants until the Fleet Note has been paid in full; that any collateral received by Chesapeake from the Defendants “shall be delivered to [Fleet] for application to the [Fleet] Debt; and that Chesapeake shall not "take or permit any action prejudicial to or inconsistent with [Fleet’s] priority position over [Chesapeake] created by this Agreement."
On July 30, 2001, Chesapeake and Omega III entered into a Security Agreement granting Chesapeake an all-asset security interest in Omega III as collateral to secure payment of the July 11, 2001 Note. The Security Agreement provides that Chesapeake may “deem itself insecure where it has "reasonable grounds" to do so.
Additionally, the Security Agreement between Omega III and Chesapeake provides that in the event the Defendants default and Chesapeake forecloses on its collateral, any excess remaining after the sale of the collateral “shall be returned to [Omega III].”
The Defendants signed an undated “Bill of Sale” purporting to transfer “all right, title and interest” in Omega III to Chesapeake, subject to a right of repurchase for $1 upon the payment in full of both the April 19, 2000 loan and the July 11, 2001 loan. The “Bill of Sale” also provides that in the event of defaults by the Defendants “under either the July 11, 2001 Note or the May 1 [sic], 2000 Note,” Defendants’ right to repurchase Omega III would terminate.
The April 19, 2000 Note lists the following as items constituting a default:
(a) fail to make any payment [and] otherwise fail to comply with the terms of this note within five (5) days of the date required by this Note; (b) commence or seek relief or consent to any bankruptcy, insolvency, reorganization, arrangement, dissolution, custodianship, conservatorship, liquidation or similar proceeding; (c) make a general assignment; reorganization or similar arrangement for the benefit of creditors; or (d) if any proceeding is instituted against the Borrowers, or either of them, for relief under any bankruptcy or insolvency law, and is not dismissed or otherwise disposed of within thirty (30) days (each an “Event of Default”).
The July 11, 2001 Note lists the following as items constituting a default:
(a) fails to make any payment [and] otherwise fail to comply with any of the terms of this note within five (5) days of the date required by this Note; (b) commences or seeks relief or consent to any bank *710 ruptcy, insolvency, reorganization, arrangement, dissolution, custodianship, conservatorship, liquidation or similar proceeding; (c) make a general assignment, reorganization or similar arrangement for the benefit of creditors; (d) defaults on any Fleet National Bank Note[;] or (e) if any proceeding is instituted against the Borrower, or either of them, for relief under any bankruptcy or insolvency law, and is not dismissed or otherwise disposed of within thirty (30) days (each an “Event of Default”).
The “Bill of Sale” purports to authorize Chesapeake, by way of a “Special Power of Attorney,” “to sell, mortgage, hypothecate, assign, transfer, and in any manner deal with Certificates of Ownership of Omega III, LLC” in the event of a default under either note.
Omega III’s 2001 year-end statements showed gross revenues exceeding $7.2 million.
In May of 2002, Chesapeake began to press the Defendants to “cure” alleged defaults under the July 11,2001 Note and Security Agreement and to remedy Chesapeake’s claimed insecurity. A meeting was held at Chesapeake’s offices on June 6, 2002, to discuss the reasons why Chesapeake felt that it was insecure.
In June of 2002, approximately $360,000 remained payable on the July 11, 2001 Note. At that time, the Defendants were making all payments due and owing to Chesapeake under both notes.
On June 7, 2002, the Defendants received from Chesapeake a “Notice of Default” alleging various violations of the July 11, 2001 Note and Security Agreement, Chesapeake deeming itself “insecure” and providing Omega III with “thirty days to cure the above events of default to the satisfaction of Chesapeake.” Included among the grounds for insecurity were the alleged “failure” of Olive Associates, an affiliate of OGC, to pay a $115,000 management fee and the alleged “failure” of Omega III to pay certain percentage rent and $30,000 in utility fees owed for English’s Kingfish Hall Restaurant.
On June 7,2002, the Defendants also received from Chesapeake a letter demanding that the Defendants “cure” the alleged defaults by transferring title to Kingfish Hall, the primary asset of Omega III, to Cafarelli and executing a forbearance agreement that memorialized a proposal made by Chesapeake to transfer ownership of Kingfish Hall to Cafarelli.
On June 18, 2002, Chesapeake filed its complaint in this action, seeking declaratory and injunctive relief in the form of an order declaring Chesapeake the owner of Omega III and appointing Cafarelli as receiver of the assets of Omega III. The request for injunctive relief was denied by this Court.
On June 28, 2002, the Defendants received from Chesapeake a letter purporting to deem Chesapeake “insecure” on the April 19, 2000 loan and threatening to declare a default unless the Defendants provided Chesapeake with additional collateral. On July 2, 2002, this latest demand was rejected.
On July 9, 2002, Chesapeake sent the Defendants a letter captioned “Exercise of Bill of Sale/July 11, 2001 Note,” informing them that all cure periods for alleged defaults on the July 11, 2001 Note had expired and purporting to accept 100% interest in Omega III “as payment in full of the outstanding principal balance due” under the July 11,2001 Note. This assertion of ownership was rejected by the Defendants.
On July 10, 2002, Fleet wrote Chesapeake, objecting to its efforts to terminate Omega Ill’s Management Agreement with Olive Group Management, LLC in violation of the representations made by Chesapeake pursuant to the terms of the Amended Revolver. Later, on July 17, 2002, Fleet wrote Chesapeake, rejecting its claim to ownership of any assets of or membership interest in Omega III. On July 18, 2002, Fleet informed Chesapeake that its attempt to obtain ownership of Omega III violated the Uniform Commercial Code.
On August 1, 2002, Chesapeake filed an amended complaint in this case, again seeking to remedy its alleged insecurity under the July 11, 2001 Note and requesting the Court to grant it “authority to operate and control the physical assets of Omega.”
On August 16, 2002, Chesapeake sent Defendants a “Notice of Default” on the April 19, 2000 Note, asserting that Defendants’ failure to provide additional collateral constituted a default on this loan. Chesapeake also stated that it intended to foreclose upon and sell its 25% interest in Olives, D.C. The Defendants responded on August 20, 2002, denying any default and opposing the proposed sale.
As of the date hereof, and at all times material to this action, both loans from Chesapeake to the Defendants have been paid in accordance with the terms of the respective promissory notes. Also, as of the date hereof, and at all times material to this action, the Fleet Note has been paid according to its terms, and Fleet has neither claimed a default nor deemed itself insecure with respect to its loan. Finally, as of the date hereof, all percentage rent and utilities currently owed by Omega III have been paid in accordance with the agreed-upon terms between the parties involved therewith.
DISCUSSION
Summary judgment is granted where there are no issues of genuine material fact, and the moving parties are entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. Rule 56(c). The Defendants, as the moving parties, bear the burden of affirmatively demonstrating that there are no material triable issues of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
*711 A key to determining the present motion involves interpretation of the Subordination Agreement executed by Chesapeake and Omega III on July 11, 2002. The agreement’s plain language becomes critical. The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contract provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., supra, 426 Mass. at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
“The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the agreement as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
Before getting into the details, it seems appropriate to comment on what appears to be happening. A subordinated creditor, Chesapeake, is attempting to find a default by its debtors, Omega III and OGC, so that Chesapeake can seize an asset worth millions of dollars more than the outstanding indebtedness. And Chesapeake is doing so despite the fact that the two notes representing loans by it are now — and so far as the record before the Court shows, always have been— fully current in payments of principal and interest on the dates that each such payment has become due. Thus, Chesapeake seems to be searching frantically to find a default, however technical, by the Defendants in their obligations to Fleet, while Fleet seems utterly indifferent to the situation between it and its debtors.
Chesapeake’s activities are all occurring despite the specific limitations imposed on it by the Subordination Agreement. Two cases, while not exactly the same as this one but exhibiting some of the same approaches, come to the Court’s mind. Linkage Corporation v. Trustees of Boston University, 425 Mass. 1, 27 (1997), and Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 472-73 (1991).
Generally, subordination agreements, like that in issue here, are to be given their practical effect. Grise v. White, 355 Mass. 698, 703-04 (1969). Where there is a clear subordination of a debt, the priority indicated in the agreement must be enforced according to its terms in the absence of specific language that priority in the security is not intended. “Subordination agreements are ‘consistently’ construed to afford substantial ‘practical’ benefits to the debt or security interest given priority.” Rosen v. A-H, Inc., 17 Mass.App.Ct. 126, 130 (1984).
Here, the Subordination Agreement between Chesapeake and Omega III affords substantial benefits to Fleet in connection with the debt and security given priority. The WHEREAS clause quoted in full above sets the scene. Basically, all indebtedness of Omega III to Chesapeake is subordinated to “all indebtedness of [Omega III] to [Fleet], direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising.” Since Fleet appears to be the Defendants’ principal financial supporter, enforcement of the Subordination Agreement by the Defendants in a way that protects their relationship with Fleet is of benefit to the Defendants as well.
Further, the Subordination Agreement provides that until such time as the Fleet debt has been paid in full — and it has not yet been so paid — Omega III may not transfer any collateral for any part of the subordinated debt or make payments to Chesapeake other than the regularly scheduled payments of principal and interest. Indeed, by the Subordination Agreement, Chesapeake assigned, transferred and set over to Fleet the Subordinated Debt, “whether evidenced by negotiable or non-negotiable instruments, securities or other writings, book entries or otherwise, together with any collateral therefor, and endorsed or assigned to” Fleet and “[^herewith deposited]” the “Secured Promissory Note from Omega III, LLC to Chesapeake Investment Services, Inc. dated July 11, 2001.”
Further, by the Subordination Agreement, Chesapeake cannot demand or accept from Omega III any such payment or collateral. And Chesapeake cannot engage in “any action prejudicial to or inconsistent with [Fleet’s] priority position over [Chesapeake] created by” the Subordination Agreement.
Consequently, any and all enforcement rights under either of the Chesapeake loans have, by the Subordination Agreement, been assigned to Fleet until such time as the Fleet loan has been paid in full. At present, therefore, Chesapeake has no enforceable rights of the kind it seeks to pursue here because the Fleet loan is not yet fully paid.
Also, any transfer of “the physical assets of Omega” III to Chesapeake would be clearly prejudicial to Fleet’s priority position over Chesapeake. It is, for that reason, barred by the Subordination Agreement.
Chesapeake, citing to the “Bill of Sale,” asks this Court to grant it the authority to “operate and control *712 the physical assets of Omega III” because it claims thereby to be “the owner of 100% interest in Omega III.” Clearly, however, the “Bill of Sale” is in effect a form of security interest in personal property, see G.L.c. 106, Sec. 9-109(a)(l), and not a transfer of title until all aspects of enforcing such security are complied with. The terms of the “Bill of Sale,” particularly the recitation that its consideration is “a loan of $450,000" and Omega Ill’s ’’right to repurchase" for “one ($1)’’ upon the payment in full of the loan, make this clear beyond doubt. Further, the July 11, 2001 Note itself recites that this instrument “shall be held by [Chesapeake] in escrow as security for this note.”
As noted above, the Subordination Agreement stands in the way of Chesapeake’s enforcement of the “Bill of Sale,” as does Chesapeake’s failure to take the steps called for by Article 9 of the U.C.C. with regard to such security. Chesapeake only recently has taken the first preliminary steps to perfecting its interest in OGC’s membership interest in Omega III.
Also, OGC’s $1 buy-back rights are not yet terminated under the language of the “Bill of Sale." No default, as therein defined, of any kind has been shown with regard to the April 19, 2000 Note. As for the July 11, 2001 Note, this Court does not consider the issues raised by Chesapeake to be defaults of the Fleet loans — nor, apparently, does Fleet — and no other default, as defined therein, is shown with regard to this note either.
ORDER
For the foregoing reasons, the Defendants’ Motion for Summary Judgment is ALLOWED, and the Plaintiffs amended complaint is Ordered Dismissed.

On June 8, 2002, each of Cafarelli and Chesapeake filed suits against the Defendants, both seeking control over the management and assets of Omega III. The Defendants have settled their dispute with Cafarelli, and a stipulation of dismissal was filed on August 29, 2002, in Cafarelli v. The Olive Group Corporation et al., Suffolk Civil Action No. 02-2656 BLS.